UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) No. 2:23-CR-0003-Z-BR-1 |
| | ) |
| SANTIAGO PARKS HOWARD-RIOS, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

ELECTRONICALLY-RECORDED PRELIMINARY REVOCATION/DETENTION HEARING
BEFORE THE HONORABLE LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE
MARCH 24, 2025
AMARILLO, TEXAS

FOR THE PLAINTIFF:

JOSHUA J. FRAUSTO
UNITED STATES ATTORNEY'S OFFICE
500 South Taylor Street
Amarillo, TX  79101
(806) 324-2322

FOR THE DEFENDANT:

PAUL HERRMANN
THE HERRMANN and ARCHERLAW FIRM, PLLC
801 S. Fillmore, Suite 710
Amarillo, TX  79101
(806) 342-4242

Proceedings recorded electronically; transcript produced by computer-aided transcription.

_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

INDEX

| Government's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| P.O. GEMA REYES | 9 | 14 | 16 | 16 |

| Defense Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| OLIVIA SAMBRANO | 4 | 7 | | |

**EXHIBITS**

| Government's Exhibit | Introduced | Admitted |
|---|---|---|
| A | 9 | 9 |

(Proceedings commenced at 1:30 PM.)

COURT SECURITY OFFICER:  All rise.

The United States District Court for the Northern District of Texas, Amarillo Division, is now in session.  The Honorable Magistrate Judge Lee Ann Reno presiding.

Please be seated.

THE COURT:  The Court calls Cause No. 2:23-CR-3-Z-BR-1, *United States of America versus Santiago Parks Howard-Rios*.

MR. FRAUSTO:  The United States is present and ready, Your Honor.

MR. HERRMANN:  Defense is ready.

THE COURT:  All right.  We're set for a Preliminary Revocation Hearing.  Let me read the Rule 5 admonition first and then we can begin.

Under Rule 5(f)(1) of the *Federal Rules of Criminal Procedure*, the United States and its counsel are ordered to comply with their disclosure obligations under the case known as *Brady versus Maryland*, 373 83 -- 373 U.S. 83, and its progeny.  The consequences of failing to do so could result in the dismissal of charges, adverse jury instructions, contempt proceedings, and other appropriate sanctions.

All right.  I do see that we have a waiver made for the Preliminary Revocation Hearing.

Is there anything else for the Court to consider?

MR. FRAUSTO:  It's my understanding that the Defense

wants to go ahead and proceed on just the matter of detention.

THE COURT:  Okay.  Correct, Mr. Herrmann?

MR. HERRMANN:  Yes, that's correct.

THE COURT:  All right.  I, because I'm a little bit of a docket nerd, will take that as an oral motion with regard to detention.  That way, when I make a ruling, I'll have something to connect that ruling to.

And as the Defendant, since you have the burden on the issue of release or detention because it's a revocation, I will let you begin.

MR. HERRMANN:  Okay.  We call Olivia Sambrano.

THE COURT:  And before you sit down, could you take the oath?

THE WITNESS:  Yes, ma'am.

THE COURT:  Do you solemnly swear that -- excuse me -- the testimony you will give today will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  All right.  Go ahead and take the witness stand, please.

DIRECT EXAMINATION

QUESTIONS BY MR. HERRMANN:

Q.   Please state your name for the record.

A.   Olivia Sambrano.

Q.   Ms. Sambrano, how are you related to Santiago Parks

Howard-Rios?

A.    I'm his fiancée.

Q.    All right.  Do you all have any children together?

A.    Yes.  We have a son.  He's five weeks today.

Q.    Slow down.  I can't even understand you.

A.    We have a son.  He's five weeks today.

Q.    Okay.  What's his name?

A.    Arias Howard-Rios.

Q.    And do you all live together?

A.    We do.

Q.    How long have you been living together?

A.    About a year.

Q.    Okay.  Is he your fiancée?

A.    Yes.

Q.    Okay.  What does he do for a living?

A.    He works for U.S. Lawns.

Q.    Okay.  How long has he done that?

A.    He just switched to that job but he's worked there on and off for years.

Q.    Full-time?

A.    Yes.

Q.    Okay.  Bringing home money?

A.    Yes.

Q.    Okay.  Where do you live?

A.    504 South Lake.

Q.   And where do you work?

A.   At Calico County.

Q.   All right.  How long have you been doing that?

A.   I'm coming up on 15 years.

Q.   If -- If he was released today, would he be able to come live at your house?

A.   Yes, sir.

Q.   All right.  And you wouldn't have any problem with that?

A.   Not at all.

Q.   And you'd do whatever the Court asked you to do as far as keeping him, you know, supervised and stuff until this is resolved?

A.   Yes, sir.

Q.   All right.  Do you think that's in the best interest of him and your family?

A.   Yes.

Q.   Okay.  Do you -- Do you know he's -- originally was charged with illegal re-entry, right?

A.   Yes.

Q.   Okay.  And he wasn't a U.S. citizen, clearly, to pick up that offense; right?

A.   Yes.

Q.   Okay.  "Yes" or "No"?

A.   Yes.

Q.   Okay.  And who is his father?

A.    James Howard-Rios.

Q.    And -- But is James Howard a U.S. citizen?

A.    Yes, sir.

Q.    All right.  And is it your understanding that he is -- I don't know exactly what the stage is, but is he considered now a citizen but the finality of the paperwork is not through or something of that nature?  What do you understand?

A.    Yes.  When they run his name, he's a citizen.  We're working on finalizing it with his lawyer.

Q.    With his what?  I'm sorry?

A.    His lawyer.

Q.    Okay.  Who's his lawyer?

A.    Nicholas.  I can't remember his last name.

Q.    All right.  Okay.  And you fully anticipate that, barring unforeseen circumstances, that that citizenship is done and just waiting on the finality of the paperwork.

A.    Yes, sir.

        MR. HERRMANN:  I'll pass the witness, Your Honor.

                    CROSS EXAMINATION

QUESTIONS BY MR. FRAUSTO:

Q.    Was Howard-Rios living with you when he evaded from law enforcement and got arrested back in December?

A.    Yes.  We were living at -- Well, it's actually his home at 504 South Lake.

Q.    Now are you aware whether or not he was using any narcotics

that day?

A.    No, sir.

Q.    And are you aware that he pled "guilty" to illegal re-entry after deportation?

A.    We -- That was before us, before we got together.

Q.    So when did you get together with him?

A.    Well, we're barely coming up on a year.  We got together in 2024 in like March -- June.

Q.    So you weren't aware that he pled "guilty" not once but twice to illegal re-entry after deportation?

A.    I don't --

Q.    And you stated to his attorney --

A.    -- know that.

Q.    -- that he may be able to get status, but his attorney right now on the immigration side is Nicholas Nevarez.  Is that correct?

A.    (Affirmative gesture).  Yes, that's his last name.

Q.    And Howard-Rios is going through the process of trying to get status but he does not have status at this point.  Is that correct?

A.    From what I understand when they run his name, they say he's a citizen.

Q.    But he doesn't have any documentation.  He's still going through the process --

A.    Oh, yes, sir.

Q.    -- with that attorney.  Is that correct?

A.    Yes, sir.

        MR. FRAUSTO:  No further questions, Your Honor.

        MR. HERRMANN:  Nothing further.

        THE COURT:  All right.  You may step down.

        THE WITNESS:  Yes.  Thank you.

        THE COURT:  Thank you, ma'am.

        MR. HERRMANN:  We rest.

        MR. FRAUSTO:  Your Honor, at this time I'd offer Government's Exhibit A which I provided a copy to Defense and to the Court which consists of the Incident Report of his arrest consisting of 31 pages.

        MR. HERRMANN:  No objection.

        THE COURT:  All right.  Exhibit A will be admitted.

        MR. FRAUSTO:  And then we'd call Gema Reyes.

        THE COURT:  Do you solemnly swear that the testimony you'll give today will be the truth, the whole truth, and nothing but the truth, so help you God?

        THE WITNESS:  I do.

        THE COURT:  All right.  Please take the stand.

                    DIRECT EXAMINATION

QUESTIONS BY MR. FRAUSTO:

Q.    Please state your name for the record.

A.    Gema Delgado-Reyes.

Q.    And are you the probation officer for Santiago Parks

Howard-Rios?

A.    Yes.

Q.    And he was placed on supervised release around February 5th of 2024.  Is that correct?

A.    Yes, that's correct.

Q.    And part of his conditions of supervised release, was one of the conditions Other Condition No. 1 that -- the fact that he shall not commit another federal, state or local offense?

A.    Correct.

Q.    Now you provided both the Defense and the Government with what's been previously marked as Government's Exhibit A.  Is that correct?

A.    Yes.

Q.    Is that the Amarillo Police Department Incident Report that details what occurred on that date and led to Santiago Parks Howard-Rios' arrest?

A.    That's correct.

Q.    Can you provide a summary, based on your review of those reports, of what led to his arrest on that date?

A.    Yes.  So on December 26th, 2024, Mr. Howard-Rios was pulled over by APD, Amarillo Police Department, for failing to signal his turn with enough distance.  So whenever officers were about to make contact with him at the vehicle, he put the vehicle in "Reverse," and at that time officers managed to put the vehicle back into "Park."  However, Mr. Howard-Rios did not follow

commands, and he continued to attempt to drive off.

For -- Due to safety concerns, the officers deployed a Taser two times during that encounter.

Q.   During the first encounter?

A.   Yes.  So that first time that they made contact with him when he was pulled over, two times officers deployed a Taser at which time Mr. Howard-Rios pulled them off, pulled off the wires, and then he managed to flee the scene in his vehicle.

Q.   And based on your -- Just quickly.  Based on your review of the police report, were they in marked patrol units and in marked uniforms?

A.   Yes.  Based on that police report, they were marked --

Q.   Okay.

A.   -- and they turned on their sirens.

Q.   And they identified themselves as officers within APD?

A.   Correct.

Q.   Okay.  Please proceed.

A.   And so he was able to break off the wires from the Tasers and fled the scene.

During him fleeing, he was driving in a reckless manner.  So the behavior consisted of him constantly backing up into the police units, almost hitting them multiple times.  At some points he was yelling at officers that they weren't police officers, and he continued to disregard any commands.

So during that pursuit, the -- he opened his door while

driving, and the officers were able to deploy another Taser.  At that point he drove off at a high rate of speed between 30 to 70 miles per hour, and then he drove into incoming traffic the wrong way on several streets, including residential streets, residential areas.

After approximately an hour and a half of them going in pursuit, he drove in front of the Police Department.  He drove to the front of the Police Department and backed into a patrol unit, causing damage to that unit.

At that point officers were able to deploy several pepperball guns and Tasers into the vehicle which allowed the officers to pull Mr. Howard-Rios through that driver's side window out of the vehicle.

Once on the ground, he tried to fight the officers, but he was eventually restrained and transported to the jail.

Q.   So in summary, he was uncooperative with law enforcement from the time he got stopped until he was arrested.  Is that correct?

A.   Correct.

Q.   Officers attempted to take him out of the vehicle multiple times and deployed a Taser three different times which were not successful.

A.   That's correct.

Q.   And you stated he traveled in residential areas.  In fact, the police reports detail that he traveled the wrong way at 75 --

70 miles per hour.  Is that correct?

A.    Yes.

Q.    And he also caused damage to some of the patrol vehicles by backing up into them?

A.    Yes.  That one patrol unit, he backed up at the Police Department.  It was one of them, and he caused damage to that vehicle.

Q.    Based on the police report, one of the officers initiated the initial Taser because they thought that the Defendant was going to back up into one of the other police officers.

A.    Yes.

Q.    And is it your understanding that Santiago Parks Howard-Rios is still here illegally and has not obtained legal status?

A.    To my understanding, yes.  That's what he's told me.

Q.    And did he also admit to pretty much the detail you provided when you did a follow-up investigation of what occurred on this date?  He admitted to evading from law enforcement and crashing into APD vehicles?

A.    Yes.  Whenever I found out about him being pulled over, I contacted him, and he called me back and basically told me that he -- that he was pulled over and that he fled the -- the scene.  He told me that he backed into a police officer unit, and so he was being charged with police assault.  So he -- he gave me a condensed version of what happened, yes.

MR. FRAUSTO:  I'll pass the witness.

CROSS EXAMINATION

QUESTIONS BY MR. HERRMANN:

Q.   Did he get a traffic ticket that you know of?

A.   I'm not sure if he got a traffic ticket.

Q.   When you said that they tased him that first time, the officer said he thought he might have been trying to back into somebody, but he realized later that person wasn't there.  So he was incorrect about that.

     Is that your reading of it?

A.   So the first time he was pulled over, that first initial traffic stop, ---

Q.   I got the whole thing.  Did you hear what I asked you?

A.   Yes.  So I'm trying to clarify.

Q.   Did you agree with what I said, that the officer said he was wrong about that?  He thought that officer was behind the vehicle but he wasn't?

A.   For the initial ---

Q.   Yes, when he tased him the first time.

A.   My understanding is the police officer saw him try to back up, --

Q.   Yeah.  And he tased ---

A.   -- so they tased him.

Q.   Yeah.  Because he thought he was going to hit somebody but that guy was not really back there.

     Did you understand that?

A.    That's the summary I have.

Q.    Okay.

A.    I'm not sure of the specific specifics of what happened.

Q.    Okay.  Nobody was injured, correct?

A.    I think ---

Q.    Correct?

A.    I don't recall if the police officer that was in the unit that he backed into, I'm not sure if he had to go to the hospital.

Q.    Okay.

A.    Details in the police report I ---

Q.    Nobody got shot.

A.    Correct.

Q.    Nobody got punched or anything like that.

A.    Correct.

Q.    All right.  He just really didn't want to stop, correct?

A.    He was evading police.

Q.    Okay.  What was the question I asked you?

A.    He didn't want to stop?

Q.    Yeah.

A.    Right.

Q.    Okay.  Is that correct?

A.    It sounds like it from the police report.

Q.    Yeah.  All right.

            MR. HERRMANN:  Nothing further.

THE COURT:  Anything from the Government?

MR. FRAUSTO:  Just one follow-up question.

REDIRECT EXAMINATION

QUESTIONS BY MR. FRAUSTO:

Q.  Defense counsel stated that no one got hurt, but officers do tell specifically on Page 12 of the Incident Report that the Defendant passed numerous vehicles going the wrong way and could have easily hit any of them, potentially killing someone.

Do you recall reading that?

A.  Yes, that's correct.

MR. FRAUSTO:  No further questions.

RECROSS EXAMINATION

QUESTIONS BY MR. HERRMANN:

Q.  But he didn't.  He didn't hit anybody.  He didn't kill anybody.

A.  According to the police report, no.

Q.  Okay.

MR. HERRMANN:  Nothing further.

MR. FRAUSTO:  No further questions, Your Honor.

THE COURT:  You may step down.  Thank you.

MR. FRAUSTO:  No further evidence.  Just brief argument, Your Honor.

THE COURT:  All right.  We'll proceed to argument.

MR. HERRMANN:  We'll reserve for close.

MR. FRAUSTO:  It will be close, Your Honor.  But I have

no further argument other than closing.

THE COURT:  I'm sorry.  Yes, evidence is closed.

All right.  Would you like to make argument, Mr. Herrmann?

MR. HERRMANN:  Yes, Judge.

Considering my client's opinion, citizen status and the original offense that he's charged with, and he is on bond for these offenses, so I think it ignores the fact that the State Government had -- has considered him safe enough to be on bond for those offenses.  And -- And the fact that he has a pending citizenship, looks like he's going to be, I think it perfectly reasonable that he be released from custody pending the outcome of these cases.

THE COURT:  Okay.  Thank you.

MR. FRAUSTO:  Your Honor, as Mr. Herrmann knows, this state always issues a bond.  There's none that are released, not -- not given a bond or detained without a bond.

But secondly, Your Honor, he's pled guilty to illegal re-entry after deportation twice.  He has tried to get some kind of status but, nevertheless, at this time he's here illegally. He's pled "guilty" to that.  That's why he's on supervised release.  He is going through the process of trying to regain status, but at this time he's in the United States illegally and has no status.

Secondly and more importantly, he had conditions that

he had to follow, and one of the more important conditions is not to commit another federal, state or local crime. And not only did he commit a felony offense from evading law enforcement, he put several people at risk. It wasn't just a simple evading down the block. He evaded for an hour and a half, as Probation testified, wrong way, high speed, crashing. Even though he didn't hit anybody, he did hit patrol vehicles and continued to try to be stopped through multiple ways of getting tased and continued to not listen to law enforcement's instructions.

So we believe he's a flight risk but, most certainly, a danger to the community, specifically based on Government's Exhibit A and the testimony provided by Probation.

Thank you, Your Honor.

THE COURT: All right.

All right. I want to take this under advisement. I'll get a ruling out this afternoon, but I have not had time to look through the Exhibit A just to read a little bit more about exactly what happened on the day in question.

Anything further from the Government's attorney?

MR. FRAUSTO: No, Your Honor.

THE COURT: Mr. Herrmann?

MR. HERRMANN: No, Your Honor.

THE COURT: All right, very good. Thank you.

(Hearing adjourned at 1:50 PM.)

CERTIFICATE OF OFFICIAL REPORTER


I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the electronically-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 17th day of April, 2025.


/s/ Deborah A. Kriegshauser
_____
DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER